[No. 20335.  Department One.  April 7, 1927.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN M. NICHOLS, *Appellant.*[1]

[1] ARSON (9)—EVIDENCE—SUFFICIENCY.  A conviction of arson in the burning of accused's dwelling house is sustained, though the evidence was all circumstantial, where there was proof of the burning of the house, of motive and opportunity to burn, the circumstances were not inconsistent with each other but were consistent with guilt, and defendant's conduct in not taking action in what he claimed to be a robbery negatived his pretensions and implicated him criminally, and damaging statements by him or in his presence were unchallenged.

Appeal from a judgment of the superior court for Spokane county, Webster, J., entered June 28, 1926, upon a trial and conviction of arson.  Affirmed.

*McCarthy, Edge & Lantz,* for appellant.

*Chas. E. Greenough* and *A. O. Colburn,* for respondent.

MITCHELL, J.—The defendant, John M. Nichols, was charged by information with the crime of having unlawfully and feloniously burned his dwelling house, situated in Spokane county, Washington, on or about January 17, 1926.  The jury found him guilty.  He has appealed from a judgment and sentence on the verdict.

The testimony in the case is wholly circumstantial.  It is quite voluminous but the facts, stated about as briefly as reasonable, are substantially as follows.  Appellant and his wife occupied and owned the building as a residence.  It was located just outside the city limits of Spokane.  The family consisted of the appellant and his wife and two small boys given to Mrs. Nichols about one month after they were born.  The boys attended a school, a little further out from

'Reported in 255 Pac. 89.

the city than their home. Appellant owned two automobiles, a Hudson and a Studebaker. On Friday, January 15, he towed the Hudson car to town, as he told another person, to have it repaired. He owned two hogs that he employed a neighbor to butcher on January 16. On the same day, as appellant's wife testified, they and the children drove into town taking the children's savings banks, had them opened by an employe she did not know at the bank that had supplied them, and used the money buying things for the boys. They returned home that afternoon about half past three o'clock. Having forgotten an intended purchase, appellant drove back to town about four o'clock. They had a dinner appointment that evening at six or seven o'clock with friends, Mr. and Mrs. Cook, proprietors of the Sheldon Hotel in the city. It was nearly eight o'clock when he returned home, stating to his wife that he had been delayed on account of tire trouble. Just before leaving for their dinner appointment, she cooked something for the boys to eat. They and the children, taking their dog with them, drove to the Sheldon Hotel, arriving as Mrs. Nichols testified, about half past eight or earlier, or nine o'clock as Mr. Cook testified. They took no night clothes with them. After dinner, they engaged in a small but merry party at the hotel in the private rooms of Mr. and Mrs. Cook. About midnight, they spoke of going home, but, upon the invitation of their hosts, decided to remain over night. Thereafter the party continued until two or three o'clock, at which time they retired for the night. They had on prior occasions spent the night with their friends.

About three o'clock that morning, Mr. Leibrecht, a neighbor, living a few hundred feet from the Nichols home, observed it on fire. He aroused his two sons, all

three taking pails as they went over to the fire. One of the boys, George, was the first on the scene. The window frame and sash in a front room were ablaze. He went to the back door, opened the screen that was not fastened and found the solid door wide open. He hallooed but got no answer. The three taking water from the kitchen sink soon extinguished the flames. Bed clothing on the bed in that room had been removed and they found on the mattress a live mineral coal of fire burning with a slow "singeing" fire in a hole three or four inches deep and about eighteen inches across. They destroyed that fire, as they supposed. They found the front door open. Still smelling smoke, they went into the living room and found live coals on a pillow or cushion nearly consumed by slow burning. It fell apart on being picked up. They noticed two kerosene oil cans sitting on the floor in the dining room, later found to be empty. Kerosene oil had been

". . . spilled all over the floor, all over the house and sprinkled over the walls and ceiling, and we smelled more smoke still, so we went to look for more fire, and we went into one of the other bed rooms and found coals in the bed there, so we put them out and I noticed a coal on the floor of the closet in that bed room."

The window in the breakfast nook was open. In the kitchen, the stove lids had been taken off and left piled on the kitchen stove and the coals had been taken out of the fire box. In the basement they found no fire, though the furnace doors were open. There was a very small quantity of fuel in the basement. The family parrot was gone, but the cage was left. They noticed as missing the clothing from two beds, the dining room rug, and that the drawers of the sideboard were open. The Leibrechts went home.

About six o'clock that morning, the newspaper boy

noticed smoke coming from the Nichols house, and he and Frank Leibrecht went over and

". . . found that fire in the bed where the window had burned wasn't out, the coals were still red, so we put those out."

About nine o'clock Sunday morning appellant, his wife and the two children drove from the hotel out to their home. Using their telephone, she called the Leibrecht house. George answered and went over. George asked them if somebody had robbed the house and set it on fire. They said "yes." The three walked around and they enumerated to George what had been stolen, including the children's banks. Appellant estimated to George his damage at one thousand dollars, and said it would have been better if the house had burned clear down. George asked him: "Hadn't you ought to call up the sheriff, or would they come out on Sunday?" Appellant said, "No, No, they wouldn't do anything on Sunday," and stated further that he would wait until Monday and bring out an insurance adjuster. Appellant and his wife spoke about cleaning up a room and staying there, but then decided to go back to the hotel. They remained there about an hour after George left.

When on the witness stand, Mrs. Nichols testified that the articles missing were as follows: An electric percolator, waffle irons, a jacket to her suit, cut glass water pitcher and tumblers, a cross fox fur, some silk comforts, wool blankets, a dining room rug, a parrot, Haviland china, silver knives and forks, two children's toy police patrols, two pairs down pillows and appellant's black overcoat. She further testified that out at the house on Sunday her husband made arrangements with George Leibrecht to take his own bed clothes and sleep at the garage to take care of the place that night. This

was denied by George. She further testified that from the house she telephoned, trying to get one of the deputy sheriffs that they were acquainted with, and that the jailer answered the call, saying the sheriff's office was closed from noon Saturday until Monday morning and that none of them were around. The jailer for that day testified that he alone answered the telephone calls and that if anyone wanted the sheriff or a deputy he always asked them to state their business if they would, and that he did not receive a call from Mrs. Nichols that day that he knew of.

She testified that on Sunday there was no evidence of violence or breaking into the house and that they securely locked the doors, and tried them, and the windows before returning to the Sheldon Hotel about noon that day and that nobody but the family had keys to the doors. They spent the afternoon at the hotel and about the city with friends. The Cooks invited other friends in for dinner after which the party engaged in music and dancing and cards. Mrs. Nichols testified she did not dance that night, that the party was trying to cheer her up. She testified that they retired about half past two or three o'clock that night and that the appellant remained in their room the rest of the night.

That night about three o'clock a neighbor, Mr. Parsons, and his son, who were sitting up with a sick member of the family, observed from a front bay window, about two hundred yards south of and across the road from the Nichols house, that the Nichols house was on fire. The flames were bursting out of the roof on the northerly side of the house. About that time he noticed an automobile of the make and appearance of the appellant's Studebaker back out of a covered garage next to the Nichols house into the road and drive towards the city. He frankly stated that he could not

from his position say positively whose car it was nor who the driver was.

Monday morning about half past eight o'clock, appellant left the hotel to take the two children to school. He returned in about thirty minutes with the two children, notified Mr. Cook that his house had been burned and then told his wife that when he got to the top of the hill, within six hundred or seven hundred feet of their place, he looked down and saw that their house had been burned to the ground and that he turned around at that point and came back, as she testified. He brought the children back to the hotel.

There is some conflict in the testimony as to what or when anything was done thereafter that morning by appellant's wife to get in touch with the sheriff's office. It does not appear that the appellant at any time personally did anything directly to advise any of the authorities concerning the fire. His wife testified that, upon the return of her husband and the two children that morning, she at once attempted by telephone to reach Mr. McEwen, a deputy sheriff they were acquainted with, and that for that purpose she got a Mr. Harbor on the telephone and tried to make an appointment for the noon hour with McEwen to meet her at her sister's hotel in the city upon his return to the sheriff's office. Mr. Harbor's remembrance was that the telephone conversation was between noon and one o'clock. In the meantime, a third party had notified the sheriff's office of the fire, and about eight o'clock that morning deputy McEwen was at the scene of the fire commencing an investigation. The appellant was arrested that day and after giving bail, probably the next day, McEwen talked with him in the county building. McEwen testified:

"Well, Mr. Nichols and I was talking and I asked him why he didn't notify us on Sunday about the fire, and he said he couldn't get the office. And I told him

there was twenty-four hour service there, and I told him where a robbery had been committed, he should have notified us. And I asked him, I said, 'John, when did you know this fire burned the house down?' He said, 'On Monday morning when I took the two boys to school.' He said he had drove by there to take the two boys to school, that was the first he knew of it.''

On cross-examination, McEwen stated, ''Just as I related is the conversation Mr. Nichols told me.'' The appellant did not deny this, indeed he did not testify at all at the trial. There were other facts and circumstances, including contradictions of some of appellant's witnesses, that somewhat strengthen the state's case, which we think need not be set out. It should be stated, however, that Mrs. Nichols denied that she said to George Leibrecht on Sunday that the children's banks had been taken by the supposed robbers.

Upon another feature of the case, the evidence showed that the house and furniture were insured for about $8,300, but not over-insured as an agent testified. There were a mortgage and other liens on the premises in the sum of nearly $3,000. His automobiles and some timber were mortgaged for $600. Real property taxes on his home were delinquent for two years and his personal property taxes were delinquent one year. He had lately borrowed money from a friend, and to a number of other creditors in various amounts he was indebted something over $1,000. These debts were from months to more than a year old, for the payment of which he was being pressed. Appellant and his family had suffered from sickness nearly all winter, and he had a few days before the fire discharged a maid who testified that they still owed her $70. Appellant and his wife had been married twenty-three years. They had lived at several places in California and at several places in this state, the last five years in Spokane county. The

year before the fire, appellant, in attempting to make a loan, in answer to questions stated that he was a bootlegger. His wife on the witness stand admitted that she had been convicted of a felony.

[1] The sole question argued by the appellant is whether or not there was sufficient evidence to justify the verdict. The house was burned. Motive and opportunity to burn were shown. Of course no one saw appellant apply the torch, but that is not indispensable. The circumstances proved are not inconsistent with each other, and at the same time they are consistent with the guilt of the appellant, as the jury were at liberty to weigh the evidence. The times referred to by different witnesses, so far as the precise hour is concerned, were estimates or approximations. Not one of the witnesses spoke otherwise. As the jury was entitled to view the evidence, the appellant's conduct in not taking action upon what he claimed to be a robbery and an attempt to burn his residence is so at variance with common experience as to negative his pretension and to implicate him criminally. Damaging statements by him or in his presence were unchallenged or, if in part denied on his behalf, presented only questions for the jury. We need not again give the details of the transaction, they have been rather freely set out heretofore as an argument of themselves. Upon the whole, it appears to us that the facts, circumstantial though they be, as the jury had a right to decide them, exclude with moral certainty every reasonable hypothesis except that of guilt.

Appellant cites a large number of arson cases in which convictions on circumstantial evidence were set aside. We have read them and others, with care. But each of them was a case unto itself. They give no help here and need not be stated or distinguished. It is

quite impossible to lay down a general rule as to the quantity of circumstantial evidence that will suffice in any case. In this case there was, in our opinion, enough evidence to justify the verdict.

Affirmed.

MACKINTOSH, C. J., MAIN, FULLERTON, and FRENCH, JJ., concur.